# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 1917 | DATE | 12/23/2003 |
| CASE TITLE | St. Charles Manufacturing, et al vs. Whirlpool Corporation, et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Whirlpool's Motion for Summary Judgment is granted as to Counts I, II, and III. St. Charles' action is dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | 12·24·03 | |
| | Notified counsel by telephone. | | date docketed | 14 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 03 DEC 23 AM 2:41 | date mailed notice | |
| WAP | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**F I L E D**

DEC 2 3 2003

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

| | |
|---|---|
| ST. CHARLES MANUFACTURING LIMITED PARTNERSHIP and ST. CHARLES ACQUISITION LIMITED PARTNERSHIP, | |
| Plaintiffs, | Case No. 03 C 1917 |
| v. | Hon. Harry D. Leinenweber |
| WHIRLPOOL CORPORATION and WHIRLPOOL KITCHENS, INC., | **DOCKETED**<br>DEC 2 4 2003 |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, St. Charles Manufacturing Limited Partnership, an Illinois limited liability partnership with its principal place of business in Virginia Beach, Virginia, and St. Charles Acquisition Limited Partnership, a Delaware limited liability partnership with its principal place of business in Virginia Beach, Virginia (collectively "St. Charles") bring this diversity suit against Whirlpool Corporation and Whirlpool Kitchens, Inc., Delaware corporations with their principal places of business in Benton Harbor, Michigan (collectively "Whirlpool") asserting claims for breach of contract (Count I), restitution, quasi-contract and unjust enrichment (Count II), and breach of agreement (Count III). Whirlpool now brings a Motion for Summary Judgment, which, as discussed in more detail below, the Court construes as a motion for

summary judgment on all counts. For the following reasons, the Court grants the motion.

## I. **BACKGROUND**

The following facts are either undisputed or taken in the light most favorable to St. Charles. Prior to March 1989, Whirlpool owned a twelve-acre parcel of real property located at 1611 East Main Street in St. Charles, Illinois (the "Property"). The Property included a large manufacturing building and two underground storage tanks. On or about March 20, 1989, Whirlpool Kitchens, Inc. and St. Charles Acquisition, Inc. entered into a contract, the "Asset Purchase Agreement Between Whirlpool Kitchens, Inc. and St. Charles Acquisition, Inc." (the "Purchase Agreement"), in which Whirlpool Kitchens, Inc. agreed to sell the Property to St. Charles Acquisition, Inc. Whirlpool was aware that during its operations on the site a number of hazardous substances had seeped into the ground at or around the Property and the parties included a section in the agreement to address the environmental contamination. In section 7.7 of the Purchase Agreement, Whirlpool agreed that "[a]s soon as reasonably practicable," it would "undertake in accordance with applicable law and regulations, such remedial action as is necessary to bring [the Property] into compliance with applicable federal, state and local environmental laws and regulations in effect on the Closing Date." It further agreed to correct any soil or groundwater contamination in accordance with prevailing governmental standards, guidelines and polices.

The parties' dispute first began sometime after the sale of the Property. St. Charles contended that, while it performed all of its obligations under the Purchase Agreement, Whirlpool had failed to clean up the Property pursuant to Section 7.7. Whirlpool, on the other hand, contended that it had undertaken the agreed upon remedial action and that it had brought the Property into compliance as promised. The issue finally came to a head after a decade of disagreement when St. Charles decided to sell the Property, and informed Whirlpool that the environmental conditions had negatively impacted the Property's marketability. Eventually, on or about March 7, 2000, the parties entered into a second agreement (the "2000 Agreement"), in which they acknowledged their disagreement and agreed to resolve the issues related to the pre-existing environmental conditions through Illinois Environmental Protection Agency (the "IEPA") voluntary programs. Whirlpool agreed "to manage . . . obtaining official recognition for the adequacy of actions taken or to be taken in respect of pre-existing environmental conditions at the Facility." In turn, St. Charles agreed that "[u]pon receipt of a 'Comprehensive' No Further Remediation letter from Illinois EPA . . . to release Whirlpool from any and all claims in respect of pre-existing conditions at the Facility." It also agreed to indemnify Whirlpool with respect to any possible future third party claims related to the Property. The parties agreed that "time is of the essence with respect to achieving the goals" set forth in the agreement. Finally, the parties agreed that the 2000 Agreement was

to be governed by and construed in accordance with the laws of the State of Michigan.

On or about July 30, 2002, Whirlpool received a No Further Remediation letter (the "NFR") for the Property from the IEPA. Despite this, on March 17, 2003, St. Charles filed a two-count complaint against Whirlpool, alleging breach of the Purchase Agreement and asserting claims for restitution, quasi-contract and unjust enrichment. The complaint made no mention of the 2000 Agreement. Whirlpool filed a counterclaim against St. Charles and this motion for summary judgment on both counts of the complaint. Several months later, St. Charles filed an amended complaint, in which it added a third count for breach of the 2000 Agreement.

Because Whirlpool did not file a new motion for summary judgment addressing the third count, St. Charles contends that Whirlpool's motion is a motion for partial summary judgment as to Counts I (breach of the Purchase Agreement) and II (restitution, quasi-contract, and unjust enrichment) of the amended complaint. In its summary judgment motion, however, Whirlpool argues that Counts I and II are barred by St. Charles' agreement to release Whirlpool from all claims based on pre-existing conditions at the Property upon Whirlpool's procurement of a comprehensive NFR. Whirlpool argues, correctly, that in addressing its summary judgment motion, the Court will have to decide whether there is a genuine issue of material fact as to whether Whirlpool satisfied its obligations under the 2000

Agreement. Accordingly, the Court will treat this as a motion for summary judgment on all counts.

## II. DISCUSSION

### A. Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In assessing the movant's claim, the Court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990);

*Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989).

### B. Merits

Whirlpool argues that the plain language of the 2000 Agreement compels summary judgment in its favor. It contends that it obtained a comprehensive NFR from the IEPA as agreed in paragraph 5.d., and that St. Charles was thus obligated to release it "from any and all claims in respect of pre-existing conditions at the [Property]." Because St. Charles' claims are based on those same pre-existing conditions, Whirlpool concludes, they must fail. St. Charles argues that there is at least a genuine issue of material fact about whether Whirlpool performed its obligation to obtain a comprehensive NFR and that summary judgment is therefore inappropriate at this stage. It contends that there is no release because Whirlpool: 1) failed to obtain a valid comprehensive NFR from the IEPA for the entire property; and 2) took more than two years to obtain the letter, thereby breaching the "time is of the essence" requirement of the 2000 Agreement. The Court will address each argument in turn.

#### 1. Scope and Validity of the NFR Letter

On one side of the parties' argument over scope and validity is the NFR itself. Whirlpool argues that by looking at the text of the letter, a reasonable jury could only find that it is a valid, comprehensive NFR that covers all of the Property.

As an initial point, it is clear that Whirlpool obtained a comprehensive NFR and not a less valuable focused NFR. St. Charles

does not appear to argue otherwise. A comprehensive NFR is a statement from the IEPA that all recognized environmental conditions and related contaminants of concern do not pose a threat to human health or the environment, while a focused letter is a statement that only a limited number of recognized environmental conditions and related contaminants of concern do not pose a threat. ILL. ADMIN. CODE tit. 35, §§ 740.210(a)(5)(i)-(ii), .420, .425, .430, .435 (2003). The letter specifically states that "[t]his comprehensive No Further Remediation Letter . . . signifies a release from further responsibilities under the Act for the performance of the approved remedial action." It further explains that the letter is "prima facie evidence" that the Remediation Site neither constitutes a threat to human health nor the environment nor requires further remediation. The Illinois EPA Site Remediation Program Environmental Notice (the "Site Notice") also describes the site investigation as comprehensive.

It also appears clear from the NFR that it applies to the entire Property. There is nothing in the NFR, the attached Site Base Map, or the attached Site Notice to suggest that any section of the Property is not covered. The NFR describes the Remediation Site as "12.0 acres . . . located at 1611 East Main Street, St. Charles, Illinois." The buildings on the property, including the former manufacturing building, are clearly included on the Site Base Map and the Site Notice includes a detailed legal description of the entire Property. While St. Charles claims that this legal description is

inaccurate, it does not suggest that the description leaves out any portion of the Property. Indeed, St. Charles never provides any detail as to how the description is inaccurate. Instead, it relies solely on a statement from an affidavit from its expert, William Thayer ("Thayer"), that a Michael E. Filipski ("Filipski") told him in May 2003 that the legal description does not accurately describe the Property. Filipski's statement is inadmissible hearsay and as Whirlpool correctly notes, an unsupported allegation, even from an expert, is insufficient to satisfy a non-movant's burden. *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994); *Demitropoulos v. Bank One Milwaukee, N.A.*, 953 F. Supp. 974, 985-86 (N.D. Ill. 1997).

Despite the dearth of indicators in the NFR that it only applies to parts of the Property, St. Charles argues that it does not include the buildings on the site. As evidence, St. Charles points to a February 2001 Status Report (the "February Report") and to an April 2001 Status Report (the "April Report") from Whirlpool's engineer Roy F. Weston, Inc. ("Weston"). In the February Report, Weston explained that the "IEPA also indicated that . . . only a NFR letter for the areas outside the building would be issued. The building would not be part of the NFR letter due to the lack of information." In the April Report, it stated that the "NFR letter will be focused on areas outside the building." These status reports were written approximately a year and a half before the IEPA issued the NFR, however, and are not conclusive evidence that the IEPA excluded the

building from the final letter. Indeed, a review of the April Report shows that Weston merely noted that "the property *may* have the following restrictions" (emphasis added) such as a focus on areas outside the building. St. Charles also points to a December 19, 2000 letter from attorneys for Dave Armbrust, a potential purchaser of the Property, to St. Charles, which notes that the IEPA officer involved in preparing the NFR informed Armbrust that it would not relate to the structure on the property or to the land located underneath that building. Yet that letter goes on to suggest that St. Charles, "utilizing the services of Roy F. Weston, Inc.," could obtain a full NFR quite easily and quickly. It simply is not evidence that the final NFR did not relate to the buildings on the Property.

St. Charles also contends that Whirlpool's Rule 30(b)(6) witness, Steven P. Willis ("Willis"), conceded that the NFR did not cover the entire site. Taken in context, however, Willis's testimony is rather ambiguous. In the deposition, St. Charles' attorney asked Willis to turn to the February Report and then read the bullet point in which Weston stated that the IEPA had indicated that it would only issue an NFR for the areas outside the building. When asked "[i]s that your understanding today, that the NFR letter was prepared only for the areas outside the building?", Willis said "yes." But two questions later, Willis was asked "just so I'm clear, it is only for areas outside the building?" and responded "that's what the IEPA seems to be saying here." It is unclear whether Willis is giving an opinion on the scope of the final NFR, or if he is agreeing with the

fact that, according to the status report, the NFR would be limited to areas outside the building. Given that there is no suggestion in the NFR that its scope is limited in any way, Willis's ambiguous deposition testimony does not create a genuine issue of material fact as to whether the final NFR covered the entire Property.

While the NFR facially appears to apply to the entire Property, St. Charles contends that it is invalid for almost two-thirds of the site because Whirlpool and Weston:

1) failed to provide the IEPA with any environmental data for the buildings on the Property and the land under the buildings, which constituted 37 percent of the Property;

2) failed to provide the IEPA with environmental data for the land north, east, and west of the building, which made up another 13 percent of the Property;

3) failed to give the IEPA sufficient environmental data for the conditions of the land under former paint thinner and heating oil underground storage tanks, another 5 percent of the Property;

4) intended to obtain a focused, not comprehensive, NFR for the contaminated Areas B and C at the site, which constituted another 10 percent of the Property, and withheld from the IEPA the fact that they knew they were submitting insufficient information for a comprehensive NFR; and

5) withheld certain material reports from the IEPA that contradicted information in submitted reports, thereby presenting the IEPA with misleading, inaccurate and incomplete information and providing the IEPA with grounds for voiding the NFR.

The Court finds St. Charles' first three contentions without merit. It is not up to the Court to question either the IEPA's process in issuing the NFR or the scrutiny the IEPA gave to Whirlpool's submissions. In determining whether to issue an NFR, the IEPA is guided by Illinois regulations that set forth the application process for an NFR. *See* ILL. ADMIN. CODE tit. 35, §§ 740.210, .420, .425. An applicant must perform a comprehensive site investigation in two phases, through which he or she identifies all recognized environmental conditions and all related contaminants that may be expected to exist at the remediation site. *Id.* § 740.420. The applicant combines the site investigation reports from Phase I and Phase II into one Site Investigation Report, which he or she then submits to the IEPA for review. *Id.* § 740.425. The applicant must also submit remediation objective reports, remedial action plans, and remedial action completion reports. *Id.* § 740.505. Although neither party attached those documents as exhibits, St. Charles does not contend that Whirlpool failed to submit them to the IEPA. In reviewing Site Investigation Reports and related activities, the IEPA is required to consider: 1) whether the report is complete and is accompanied by the information and supporting documentation necessary to evaluate the site investigation activities; 2) whether the site investigation has been conducted in accordance with the established procedures, including whether the comprehensive site investigation has been designed and implemented in accordance with Section 740.420 and whether all sampling and analysis activities have been conducted

in accordance with Section 740.415; and 3) whether the interpretations and conclusions reached are supported by the information gathered. *Id.* § 740.510. It was up to the IEPA to determine whether it had sufficient environmental data for the buildings, the land under the buildings, the land north, east, and west of the building, and the land under former paint thinner and heating oil underground storage tanks. The Court must assume that the IEPA reviewed its application for the letter carefully and thoroughly. If the IEPA found the materials submitted by Whirlpool to be insufficient or incomplete given Whirlpool's description of the Property or given the information it had about the Property from the Site Base Map, it certainly had the authority to request more information or to deny the application.

St. Charles' claim that Weston and Whirlpool deceived the IEPA with respect to Areas B and C of the Property also fails. St. Charles argues that Whirlpool admitted in writing that it "had no intention" of obtaining a comprehensive NFR for those Areas and again points to the February Report as evidence. In that report, Weston merely noted that Areas B and C "require[] no further evaluation to obtain a focused NFR, but will require some Environmental Land Use Controls." This language neither evinces Whirlpool's intention to obtain only a focused letter for those areas, nor proves that Whirlpool knew that it was submitting insufficient information for a comprehensive NFR.

Finally, St. Charles argues that Whirlpool improperly withheld the February Report, a December 1990 Weston Site Investigation Report

Summary, and a December 1988 Report. As discussed, the February Report does not demonstrate Whirlpool's intention to obtain a focused NFR for various parts of the Property. What it does show is that the IEPA, which cautioned Whirlpool that a comprehensive NFR might not issue for the land under the building, knew very well that there were problems with that portion of the land and had not been misled in the least in that regard. Furthermore, the December 1988 and December 1990 reports were presumably supplanted by the Site Investigation Report prepared in the application process for the NFR.

The Court notes that the IEPA has the authority to void the NFR pursuant to 415 ILL. COMP. STAT. ANN. 5/58/10(f). If the IEPA were to do so, it would be clear that Whirlpool did not satisfy its obligation, but at this time, the Court finds that Whirlpool obtained a valid, comprehensive NFR for the entire Property.

### 2.  *Timeliness of the NFR*

St. Charles also contends that Whirlpool breached the 2000 Agreement by failing to obtain the NFR in a timely manner. The parties included a clause in the 2000 Agreement that states that "[t]he parties agree that time is of the essence with respect to achieving the goals contemplated under this Agreement, and agree to cooperate and work expeditiously to achieve these ends." Although the parties agreed to this clause on March 7, 2000, the NFR was dated July 30, 2002 and St. Charles signed the Property Owner Certification of the NFR Letter on August 9, 2002. St. Charles' expert, Thayer, opines that Whirlpool and Weston could have taken various steps that

would have expedited the IEPA's review process but he provides no insight into whether those steps would have shaved off a year of review time or merely a few weeks or days. He also faults Whirlpool for asking the IEPA to review and rely on reports that had been prepared many years earlier and claims that this increased the review time and project schedule. Elsewhere in his affidavit, however, Thayer condemns Whirlpool for *not* providing the IEPA with old reports such as the December 1988 and December 1990 reports discussed above. St. Charles adduces no other evidence that Whirlpool did not work expeditiously in obtaining the NFR.

It is well recognized under Michigan law, which governs the 2000 Agreement, "that when time is made of the essence of the contract and one of the parties fails to perform within a reasonable time, the innocent party may seek to have the contract rescinded." *Cooper v. Klopfenstein*, 185 N.W.2d 604, 606-07 (Mich. Ct. App. 1971). Given that the 2000 Agreement established no specific deadline and that the IEPA was in large part in control of the process, it does not appear that Whirlpool failed to work expeditiously to obtain the NFR or that it failed to obtain the NFR within a reasonable time.

The 2000 Agreement states clearly and unambiguously that "[u]pon receipt of a 'Comprehensive' No Further Remediation letter from the Illinois EPA . . . St. Charles agrees to release Whirlpool" from claims relating to pre-existing conditions at the facility and to indemnify it with respect to third party claims. Whirlpool obtained a comprehensive NFR and, by satisfying its end of the bargain, should

have been released from claims relating to pre-existing conditions at the Property. St. Charles' claim for breach of the 2000 Agreement is without merit, and accordingly, its claims for breach of the Purchase Agreement and for restitution, quasi-contract and unjust enrichment must fail.

## CONCLUSION

For the reasons set forth above, Whirlpool's Motion for Summary Judgment is granted as to Counts I, II, and III. St. Charles' action is dismissed in its entirety.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Date: November 23, 2003